**Lawrence O'CONNOR, et al., Plaintiffs,**

**v.**

**BOEING NORTH AMERICAN, INC., et al., Defendants.**

**No. CV 97–1554ABC(RCX).**

United States District Court,
C.D. California,
Los Angeles Division.

July 13, 1998.

A. Barry Cappello, J. Paul Gignac, Mikal J. Apenes, Cappello & McCann, Santa Barbara, CA, Tina B. Nieves, Hector G. Gancedo, Gancedo & Nieves, Pasadena, CA, for plaintiffs.

John A. Reding, William W. Schofield, Barry N. Endick, Peter C. Meier, Paul, Hastings, Janofsky & Walker, San Francisco, CA, for defendants.

## ORDER RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

COLLINS, District Judge.

Plaintiffs' motion for class certification came on regularly for hearing before this Court on July 13, 1998. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Plaintiffs' motion is GRANTED.

### I. Background

The factual background and procedural posture of this case are well known to the parties and to the Court and, therefore, need not be recited at length here. On October 20, 1997, the Court denied, without prejudice, Plaintiffs LAURENCE O'CONNER et al.'s ("Plaintiffs") motion for class certification of their action against Defendants BOEING NORTH AMERICAN, INC. and ROCKWELL INTERNATIONAL CORPORATION ("Defendants") and granted Plaintiffs leave to amend their Second Amended Complaint. The Court's October 20, 1997 Order provided Plaintiffs with a detailed analysis of its concerns relating to class certification of this action. In response, Plaintiffs filed a Third Amended Complaint on December 22, 1997 ("TAC"). Subsequently, on January 26, 1998, Defendants filed a motion to dismiss and to strike portions of Plaintiff's TAC, which the Court denied in part, and granted in part on March 9, 1998.

At the March 9, 1998 hearing of Defendants' motion to dismiss, the Court granted Plaintiffs leave to file a Fourth Amended Complaint ("FAC") and ordered Plaintiffs to file a renewed motion for class certification thereafter. Additionally, the Court granted Defendants an extension of time to respond to Plaintiffs' FAC so as to enable the Court to first determine the class certification issue before hearing any further motions. On March 30, 1998, Plaintiffs filed their FAC and on April 15, 1998, the instant motion for class certification ("Motion"). Defendants filed their opposition to Plaintiffs' Motion on May 18, 1998 ("Opposition"). On June 15, 1998, Plaintiffs filed their reply ("Reply").

### II. Class Allegations

Plaintiffs bring this action on their own behalf and/or as representatives of the classes they seek to certify based on activities conducted by Defendants at the Santa Susana Field Laboratory ("SSFL"), the Canoga Facility ("Canoga"), the De Soto Facility ("De Soto"), and the Hughes Facility ("Hughes") (collectively, the "Rocketdyne Facilities"), resulting in the alleged release of:

radioactive contaminants and hazardous, non-radioactive substances, including, but not limited to, chromium, plutonium, uranium, beryllium, hydrazine, cesium and tritium, and carcinogenic chemical compounds, including hexavalent chromium, tricholoroethylene ("TCE") and ammonium perchlorate, as well as other toxic solvents, into the environment and into the air, soil and ground water

FAC, ¶ 2. Plaintiffs allege that, as a result of Defendants' release of the above chemicals, Plaintiffs have been significantly exposed to radioactive and hazardous substances, increasing Plaintiffs' risk of contracting serious latent diseases such as cancer. *Id.* at ¶ 4. In addition, Plaintiffs allege that their person and/or real property has been injured by

Defendants' releases of chemicals into the environment, the continuing contamination of Plaintiffs' property, the proximity of Plaintiffs' property to the Rocketdyne Facilities, and the continuing health hazards posed by the Rocketdyne Facilities. *Id.* at ¶ 3.

Plaintiffs Lawrence O'Connor, Margaret O'Connor, Robert Grandinetti, Donald Reed, William Rueger, Mary Jane Vroman, Harold Samuels and Joyce Samuels ("Representative Plaintiffs")[1] seek to represent three separate classes, defined as follows:

a. *Class I:* "All persons: (1) who presently reside or work in the Contamination Area or who, at any time since 1946, have resided or worked in the Contamination Area; and (2) who have not been diagnosed with a type of cancer or other serious illness or disease which may be attributed to exposure to the radioactive contaminants and/or hazardous, non-radioactive substances released from the Rocketdyne Facilities."

b. *Class II:* "All persons who own real property located within the Contamination Area."

c. *Class III:* "All persons who presently reside or work in the Contamination Area and/or who own real property located within the Contamination Area."

FAC, ¶ 92. Defendants' present or former employees are excluded from Class I and Defendants, their parents, subsidiaries, divisions and affiliates are excluded from Classes II and III. *Id.* at ¶¶ 93–94. The Contamination Area that is part of the above class definitions "consists of a geographic region within the greater San Fernando and Simi Valley area through which radioactive contaminants and/or hazardous, non-radioactive substances released from the Rocketdyne Facilities were dispersed by means of air currents, surface water runoff, and subsurface groundwater." *Id.* at ¶ 91. The geographic boundaries of the Contamination Area are defined by "plumes" mapped out by Plaintiffs' experts.[2]

The Representative Plaintiffs for Class I seek (1) declaratory relief that "Defendants' discharge of radioactive contaminants and/or hazardous, non-radioactive substances into the environment from the Rocketdyne Facilities is unlawful and violates both federal and state law"; and (2) "the establishment of a comprehensive, court-supervised program of medical monitoring designed to ensure the early detection of any latent diseases, illnesses and/or other health problems for members of Class I who, as a result of their exposure to the radioactive contaminants and/or hazardous, non-radioactive substances released into the environment form the Rocketdyne Facilities, have an increased risk of such health problems." FAC at 67:15–25.

The Representative Plaintiffs for Classes II and III seek mandatory injunctive relief requiring Defendants to:

(1) make public all information in their possession, custody or control necessary to alert class members to the risks posed by the operation of the Rocketdyne Facilities;

(2) refrain from discharging radioactive contaminants and/or hazardous, non-radioactive substances into the environment from the Rocketdyne Facilities; and

(3) clean up the conditions caused by Defendants' release of radioactive contaminants and/or hazardous, non-radioactive substances into the environment from the Rocketdyne Facilities.

FAC at 68:6–14. Both classes also seek punitive and exemplary damages to be determined at trial. *Id.* at 17–18. Representative Plaintiffs for Class II pray separately for relief in the form of compensatory damages.

---

1. The Samuels are the representatives of Class I. They have lived in Woodland Hills since 1960 and currently have no medical problems associated with radioactive contaminants or hazardous, non-radioactive substances. FAC, ¶ 13. The O'Connors, Mrs. Vroman, Mr. Grandinetii, Mr. Reed and Mr. Reuger are the representatives of Classes II and III. *Id.* at ¶ 96. Each owns real property in either Woodland Hills, Chatsworth, Simi Valley, Santa Susana, and either have been personally diagnosed with cancer or have a close relative who has been diagnosed with cancer. *Id.* at ¶¶ 8–12.

2. Through modeling, Plaintiffs' experts have mapped out both groundwater and air plumes on toxic dispersion maps that estimate how far the chemicals TCE and hexavalent chromium may have traveled off-site from the SSFL and Canoga facilities. *See* Thielemann Decl., Ex. 1; Hagar Decl., Ex. 3; Sears Decl., Exs. 3–6.

*Id.* at 68:4–5; 17–18. The Representative Plaintiffs for Class III also separately seek response costs to the extent permitted under the Comprehensive Environmental Response Compensation Liability Act, 42 U.S.C. § 9659 ("CERCLA") and applicable law, as well as for an order requiring Defendants to disgorge and restore to the Class III members all wrongfully obtained monies as a result of Defendants' alleged "unfair, deceptive and unlawful practice of discharging radioactive contaminants and hazardous, non-radioactive substances into the environment surrounding the Rocketdyne Facilities." *Id.* at 68:16; 19–24.

## III. Discussion

### A. Standard

■■■ Class actions are governed by Federal Rule of Civil Procedure 23 ("Rule 23"). The party seeking class certification bears the burden of demonstrating that all four prerequisites of Rule 23(a) and at least one of the requirements of Rule 23(b) have been met. *Rex v. Owens,* 585 F.2d 432, 435 (10th Cir.1978); *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308 (9th Cir.1977); *Gillibeau v. Richmond,* 417 F.2d 426, 432 (9th Cir.1969); *see also* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1759 at 102–04 (1986) ("Wright, Miller, & Kane"). However, whether to certify a class is within the "trial court's considered discretion." *Doninger,* 564 F.2d at 1309 (quoting *Price v. Lucky Stores, Inc.,* 501 F.2d 1177, 1179 (9th Cir.1974)). In certifying a class, the court should keep in mind the dual purposes of Rule 23:(1) to promote judicial economy through the efficient resolution of multiple claims in a single action; and (2) to provide persons with smaller claims, who would otherwise be economically precluded from doing so, the opportunity to assert their rights. Wright, Miller & Kane § 1754 at 49; Schwarzer, Tashima & Wagstaffe, *Cal.Prac. Guide: Fed.Civ.Pro. Before Trial* § 10:250 (The Rutter Group 1998) ("Schwarzer, Tashima, & Wagstaffe").

■■■ Before certifying a class, the court "must conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met." *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227 (9th Cir.1996) (citing *In re American Medical Sys.,* 75 F.3d 1069 (6th Cir. 1996)). However, "an inquiry into the merits of the claims of the representative or the class is inappropriate when making the decision whether the action should be certified under Rule 23." Wright, Miller & Kane § 1759 at 99; *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 178 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Valentino,* 97 F.3d at 1232. Nevertheless, the court may find it necessary to look beyond the pleadings at the substantive claims of the parties to determine whether the elements of Rule 23 have been met. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (determining class certification "generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"); *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) (explaining that the "court certainly may look past the pleadings to determine whether the requirements of Rule 23 have been met."); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir. 1992) (finding that the court may consider evidence to ascertain whether Rule 23 has been met although the evidence relates to the merits); *In re Unioil Secs. Litig.,* 107 F.R.D. 615, 618 (C.D.Cal.1985) ("notwithstanding its obligation to take the allegations in the complaint as true, the Court is at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case.").

The party seeking class certification must first establish that the following prerequisites of Rule 23(a) are satisfied:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.Pro. 23(a). In addition, to maintain a class action the proponent must demonstrate that either (1) there is a risk that prosecution of separate actions would create a risk of incompatible standards of conduct for the party opposing certification or create a risk of prejudice to individual class members not parties to the actions; (2) injunctive or declaratory relief would benefit the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and the class action is the superior method for a fair and efficient adjudication of the case. Fed.R.Civ.Pro. 23(b).

## B. Rule 23(a) Prerequisites

### 1. Numerosity

#### a. *Standard*

■ ▮ Rule 23(a)(1) requires that a class be so numerous that joinder is impracticable. To satisfy Rule 23's requirements, the proponent must first establish that a class does in . fact exist. Wright, Miller & Kane, § 1760 at 115. A class definition should be "precise, objective, and presently ascertainable." Manual for Complex Litigation, Third § 30.14, at 217 (1995). However, the class need not be "so ascertainable that every potential member can be identified at the commencement of the action." Wright, Miller & Kane, § 1760 at 117. As long as "the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *Id.* at 118. Thus, a class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member. *See Aiken v. Obledo,* 442 F.Supp. 628, 658 (E.D.Cal.1977). Finally, due to notice requirements, class definitions of actions maintained under Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2). Man-

ual for Complex Litigation, Third § 30.14, at 217.

▮ Next, the party seeking certification must demonstrate that the size of the class defined makes joinder impracticable. The proponent need not, however, show that joinder is impossible. *See e.g., Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909 (9th Cir.1964). Because the courts have not articulated an exact numerical cut-off, whether the numerosity requirement has been met depends on the facts of each case. *See e.g., General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980); *Perez–Funez v. District Director, I.N.S.,* 611 F.Supp. 990, 995 (C.D.Cal.1984). Although the proponent is not required to establish the exact number of potential class members, a bare allegation of numerosity is insufficient to meet Rule 23's prerequisite. *See Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925 (11th Cir.1983); *Vergara v. Hampton,* 581 F.2d 1281, 1284 (7th Cir.1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979).

#### b. *Analysis Re: Reasonableness of Plaintiffs' Class Definition*

▮ As in its first motion for class certification, the Classes Plaintiffs purport to certify are defined as persons who have lived, worked, and/or owned real property in a bounded geographic area "through which radioactive contaminants and/or hazardous, non-radioactive substance released from the Rocketdyne Facilities were dispersed by means of air currents, surface runoff, and subsurface groundwater." FAC, ¶ 91. Because "general outlines of the membership of the class" are all that are required for Rule 23, courts have found that a definable class may be established by geographic boundaries. *See e.g., Boggs v. Divested Atomic Corp.,* 141 F.R.D. 58, 60–61 (S.D.Ohio 1991) (certifying class defined as persons within six miles of boundaries of plant that released hazardous materials);[3] *Yslava v. Hughes*

---

**3.** The Court notes that the class in *Boggs* was decertified. *See Boggs v. Divested Atomic Corp.,* Case No. C–2–90–840 (S.D.Ohio, March 24, 1997), Opinion Ruling Upon a Number of Pending Motions, attached as Ex. K to Meier Decl. However, it is also important to note that the

court decertified the 23(1)(A) class in *Boggs* because Plaintiffs' claim for injunctive relief was dismissed, removing the original basis for certifying the class. *Id.* at 382(15). In addition, the court concluded: "That does not necessarily mean that this litigation will not ultimately pro-

*Aircraft Co.*, 845 F.Supp. 705, 712 (D.Ariz. 1993) (certifying class based on geographic areas in which plaintiffs lived and went to school where defendant supplied contaminated drinking water); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D.Col.1993) (certifying class defined by geographic boundaries based on dose or exposure contours of radioactive and non-radioactive materials); *Reilly v. Gould, Inc.*, 965 F.Supp. 588, 596 (M.D.Pa.1997) (finding definable class existed based on geographic boundaries that established class members, but ultimately granting defendant's motion to dismiss class action). However, while Plaintiffs need not prove that class members have been injured for purposes of defining the Class,[4] Plaintiffs' class definitions must have some relation to the Defendants' activities. *See Daigle v. Shell Oil Company*, 133 F.R.D. 600, 602–03 (D.Col.1990) (concluding that plaintiffs failed to identify a class defined by geographic boundaries because plaintiffs "failed to identify any logical reason relating to the defendants' activities.").

In its prior Order, the Court found Plaintiffs' Class definition based on a geographic area insufficient because although Plaintiffs "established that some hazardous substances have traveled off of the Rocketdyne Facilities sites," Plaintiffs "failed to provide the Court with sufficient evidence showing that these releases traveled throughout the entire Contamination Area."[5] Oct. 10, 1997 Order at 12:12–22; 14:8–10 ("Prior Order"). Howev-

er, in their renewed motion for class certification, Plaintiffs do submit evidence, in the form of toxic dispersion maps based on experts' models, to support their establishment of the Contamination Area boundaries. Through modeling based on assumptions, as well as the nature and extent of Defendants' activities and extent of on-site contamination, Plaintiffs' experts demonstrate how (1) TCE dispersed from the SSFL through groundwater ("Groundwater Plume"); and (2) hexavalent chromium dispersed through the air from the SSFL and Canoga facilities ("SSFL Air Plume" and "Canoga Air Plume," collectively, "Air Plumes"), could migrate off-site and into the surrounding neighborhoods, exposing the local population to hazardous substances. Motion at 5:17–22. These Plumes are used by Plaintiffs to form the actual boundaries of the Contamination Area.[6]

■ Despite Plaintiffs' inclusion of toxic dispersion maps in the instant motion, Defendants argue that Plaintiffs "have failed to produce even a shred of the specific and legally mandated evidence this Court warned last year would be necessary" for class certification. Opp. at 2:11–14. Specifically, Defendants contend that Plaintiffs' experts' creation of the Plumes which comprise the Contamination Area is based on release assumptions unsupported by the actual data and does not illustrate any actual contamination of any property or exposure of any indi-

---

ceed as a class action. Rather, the Plaintiffs must file a renewed motion seeking certification, pursuant to Rule 23(b)(3)." *Id.* Thus, the *Boggs* decertification does not change the certifying court's analysis to which this Order cites.

4. Such an inquiry would require the Court to delve into the merits of Plaintiffs' case, an inappropriate inquiry at this stage. *See Valentino*, 97 F.3d at 1232.

5. In its prior Order the Court explained that in determining whether "Plaintiffs have adequately defined their class based on the Contamination Area, the Court should ask:
 '(1) is there any evidence that the [Rocketdyne Facilities] ha[ve] discharged radioactive or hazardous substances beyond its borders? And
 (2) if so, have those substances traveled up to [the geographic area which defines the Class]?' "

Order at 12:5–11 (quoting *Boggs*, 141 F.R.D. at 61). Thus, Plaintiffs now attempt to demonstrate that their definition is adequate by presenting evidence "suggest[ing] the answers to both questions is yes." *Boggs*, 141 F.R.D. at 61.

6. Although the Court finds Plaintiffs' Class definitions sufficiently definite so that it is administratively feasible to ascertain Class members, the Court requests that Plaintiffs provide concrete boundaries, such as streets or map coordinates, rather than simply a map of the Contamination Area. It will otherwise be difficult for the Court to describe the Contamination Area without having to attach a map to its orders. In addition, for notification purposes, it will be easier for potential plaintiffs to determine if they are members of a Class if street names or coordinates are provided as opposed to a map.

vidual.[7] *Id.* at 3:22–4:4. Thus, Defendants assert that Plaintiffs' selection of the Contamination Area boundaries to define their Classes continues to be arbitrary and not reasonably related to Defendants' alleged activities at the Rocketdyne Facilities. The Court addresses the sufficiency of Plaintiffs' evidence submitted to demonstrate the reasonableness of its Class definitions below.

### (1) Groundwater Plume—Testimony of Frank J. Hagar

In order to demonstrate to the Court that its Contamination Area boundaries are reasonably related to Defendants' alleged activities resulting in the release of hazardous substances from the Rocketdyne Facilities, Plaintiffs first submit the opinion of Frank J. Hagar ("Hagar"), an engineering geologist and hydrologist, who has created an advective transport model[8] to determine the spread of TCE released from the SSFL facility into the groundwater over the past fifty years. Hagar Decl., ¶¶ 2–3, 7. Hagar's model was created "to predict, using existing data and reasonable approximations of hydrologic parameters, whether there was potential for TCE and other hazardous chemicals in the groundwater beneath the SSFL to migrate toward the San Fernando Valley located

southeast of SSFL and the Simi Valley located north of the SSFL." *Id.* at ¶ 10. In creating his model, Hagar relied on assumptions provided by Plaintiffs' counsel, as well as information obtained from public documents. *Id.*, Appendix A at 4 (Executive Summary of SSFL Advective Transport Model Simulation), Ex. 2 (Bibliography Report). For example, Hagar's calculations for his groundwater simulation assumed that 800,000 gallons (or particles) of TCE were distributed into the groundwater beneath SSFL over a fifty year period.[9] Hagar Depo. at 84:18–85:1.

Defendants contend that Hagar's groundwater simulation does not provide evidence of migration of toxic chemicals from the Rocketdyne Facilities throughout the Contamination Area because the model is based on assumptions and "actual test data has shown TCE as 'non-detectable' in areas within Mr. Hagar's 'plume.'" Chuck M. Dickens Decl., ¶ 9.[10] Defendants argue that Hagar's assumption that 800,000 gallons of TCE was released from SSFL into the groundwater is higher than estimates accepted by NASA[11] and does not take into consideration possible dispersion, diffusion, or absorption of the TCE. Opp. at 5:15–6:12. In addition, Defen-

7. Defendants object to the evidence presented by Plaintiff's experts, Frank J. Hagar (TCE), Robert Sears (hexavalent chromium), John D. Radke (property), and Vera S. Byers, M.D. (medical monitoring program), and move for a Federal Rule of Evidence 104(a) *Daubert* hearing in the event the Court relies on any of the above experts' testimony. Defendants' objections, however, are directed at the *merits* of Plaintiffs' claims, which are not currently before this Court. *Valentino*, 97 F.3d at 1232. At this stage of the litigation, therefore, an inquiry into the admissibility of Plaintiffs' proposed expert testimony as set forth in *Daubert* would be inappropriate. *See, e.g., In re Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. 18, 25–26 (N.D.Ga.1997) (agreeing that expert's analysis was subject to *Daubert* test to determine admissibility in court proceedings, but finding *Daubert* inquiry unnecessary at class certification stage). Moreover, the Court may revisit this issue after discovery has been completed and the parties submit the scientific evidence on which they intend to rely for dispositive motions and/or trial.

8. An advective transport model tracks the movement of a series of particles released into the groundwater based on the permeability and oth-

er advective properties of the medium the particles move through and on the model movement and advective properties of the particles in question. *See* Hagar Decl., Appendix A at § 4.0; Hagar Depo. at 78:19–79:18.

9. Hagar did not assume, however, that the 800,000 particles were distributed evenly over a fifty-year period. Rather, he used a logarithmic distribution in five-year increments, increasing the number of particles in the groundwater with time. Hagar Depo. at 86:9–87:17.

10. Chuck M. Dickens ("Dickens") is a hydrogeologist of Groundwater Resources Consultants, Inc., in Tucson, Arizona who has been involved in the assessment of hydrogeologic and water quality conditions at the SSFL since the 1980's. Dickens Decl., ¶¶ 1, 3.

11. *See* Thielemann Decl., Ex. 18, Environmental Cleanup Costs: NASA Is Making Progress in Identifying Contamination, but More Effort Is Needed (June 1997) at 10–11 (explaining that a 1993 release assessment report prepared by a contractor for NASA stated that 530,358 gallons of TCE were released into the ground at SSFL).

dants contend that Hagar's model does not speak to the concentration levels of TCE that might be found within the Groundwater Plume. *Id.* at 7:1–6. Finally, Defendants contend that Hagar's Groundwater Plume is only a theoretical model of where TCE could have gone and that, because recent tests of domestic use water show no detectable levels of TCE, Plaintiffs have not and cannot show any exposures to the Groundwater Plume. *Id.* at 7:18–9:17.

Although Hagar conducted his groundwater simulation based on an *assumed* release of 800,000 gallons of TCE, the Court finds that this assumption does not affect the validity of Hagar's model used to demonstrate the *migration* of TCE from the SSFL through the Contamination Area. First, the 800,000 gallon estimate is not an arbitrary figure. For instance, a 1985 investigation determined that "the total quantity of TCE used at the SSFL facility from 1953 through 1961 might range from about 400,000 to 800,000 gallons" based on Defendants' estimated use of 50 to 100 gallons of TCE per engine test. Thielemann Decl., Ex. 17, Hargis & Assoc., *Phase I Investigation of Hydrogeologic Conditions Santa Susana Filed Laboratory, Ventura County, California, Volume 1 ("Phase I")* (Feb. 22, 1985) at 7 (BNA 043465). In addition, as Defendants note, a NASA contractor estimated the release of 530,358 gallons of TCE from the SSFL from 1954 through 1961. *Id.*, Ex. 18 at 11. Hagar's model, on the other hand, is based on TCE discharged from the SSFL during not only the 1950's and 1960's, but also the 1970's and 1980's. Hagar Supp.Decl., ¶ 5.

Moreover, the amount of TCE actually released only affects the *concentration* of TCE in the groundwater, not the *migration* of TCE as described by Hagar's model. As

Hagar testified at his deposition, "I used 800,000 [particles] because that was a number that I could easily divide up. I could have just as easily used 10 or 12, but by using 800,000 I was able to put in a variety of—a number of particles, I could watch the distribution of particles." Hagar Depo. at 120:24–121:26. Hagar went on to explain that because "I used a logarithmic distribution to investigate the amount of distance a particle could move over time[,] [i]f I put in 12 particles and I used in [sic] one in the first year and four in the fifth year and so on, I'd run out of particles pretty quickly." *Id.* at 122:2–17. Finally, when asked whether "it makes a difference as to the extent of the plume as to the number of particles" used, Hagar answered:

> The extent of the plume is not solely based on the number of particles the extent of the plume is. We use the particles to define the extent of the plume. The plume is generated because of the groundwater flow. The plume is there whether the particles are in it or not. If there's particles in it, they travel with the water.

*Id.*

Thus, if less than 800,000 gallons of TCE were actually released from the SSFL, Hagar's Groundwater Plume would still extend as far as it does because those particles that were released would have traveled with the groundwater. In addition, although Defendants stress that Hagar's model does not reflect the concentration levels of the allegedly discharged TCE, the concentration levels are irrelevant at this stage of the litigation as this concerns the *merits* of Plaintiffs' claims against Defendants rather than whether Plaintiffs have met the requirements of Rule 23.[12] *See, e.g., Valentino,* 97 F.3d at

---

12. In its prior Order the Court rejected Plaintiff's evidence of off-site migration of radionuclides from the SSFL because it was based on a report finding concentration levels within regulatory limits. Prior Order at 13:3–17 (explaining that "[b]ecause Plaintiffs rely on Woodward's projection of emission levels [throughout the Contamination Area], they must also accept his findings that the releases of radioactive isotopes were within regulatory limits."). In addition, Plaintiffs did not present any other projection levels of their own to establish the reasonableness of the

Contamination Area in their first motion for class certification.

In the instant motion, however, while Defendants argue that Hagar's conclusions are not supported by available test data showing TCE as non-detectable within Hagar's 'Groundwater Plume, the testing relied on by Defendants is recent and does not demonstrate what the TCE concentration levels looked like in the 1950's, 1960's, 1970's, or early 1980's. *See* Dickens Decl., ¶ 9; Meier Decl., Exs. A–G (various water quality reports dated from 1989–1997 and a 1986

1232 (rejecting use of preliminary hearing to determine merits of litigation when performing Rule 23 analysis).

Moreover, the data relied on by Defendants to support their argument that no TCE contamination exists relates to water testing performed in the late 1980's and the 1990's, when TCE released during the 1950's through 1970's would have already migrated past the monitoring point.[13] Opp. at 7:11–15; 9:1–17; Meier Decl., Exs. A–G; Hagar Supp. Decl., ¶ 7 ("The fact that TCE or other contaminants are not detected today would not be evidence that TCE or other contaminants did not at some time flow past the SSFL test

wells or at greater depths than is currently being monitored."); *see also* note 12 *supra.* Considering Defendants' admission that TCE was released from the SSFL [14] and that Defendants have not provided data thus far indicating non-contamination in water testing performed prior to the late 1980's, Defendants' reliance on recent water testing to refute the reliability of Hagar's Groundwater Plume is unavailing.[15] Thus, the Court finds that Hagar's model demonstrates how TCE released into groundwater originating beneath the SSFL "would have flowed to the north into the Simi Valley and the east and southeast into the San Fernando Valley," as

Water Master Plan Update for Ventura County). See also discussion *infra* at note 13 and accompanying text. Thus, because Defendants have not otherwise rebutted Plaintiffs' evidence by showing that concentration levels of TCE from the 1950's to the 1980's were always within regulatory limits, and because an independent inquiry by the Court would delve into merit-based issues not suitable at this stage of the litigation, the Court finds that the Hagar Groundwater Plume adequately defines the Contamination Area boundaries despite the fact that it does not estimate TCE concentration levels.

13. To support their contention that Hagar's model is not based on real world data, Defendants rely on their expert Dickens' declaration in which Dickens declares that "[m]any periphery monitor wells and private wells have been sampled and shown to be free of contamination within the plume areas Mr. Hagar has delineated." Dickens Decl., ¶ 9. The only well-sampling to which Dickens specifically refers, however, occurred in *1997. Id.* at ¶ 5. Dickens does not provide any data regarding well-sampling prior to the 1980's. In fact, Dickens did not become involved in the assessment of hydrogeologic and water quality conditions at the SSFL until the 1980's. *Id.* at ¶ 3.

In addition, Defendants argue that the most recent tests of water supplied to Bell Canyon residents, just south of the SSFL, indicate no detectable amounts of TCE. Opp. at 9:1–5. However, this data comes from *1996* and *1997* Water Quality Tables. Meier Decl., Ex. B, Ventura County Waterworks District No. 17, 1996 & 1997 Water Quality Tables, at 20–21, 24–25. In addition, the Ventura County Waterworks District No. 17 was not created until April *1977. Id.* at 24. Similarly, Defendants submit that Ventura County Waterworks District No. 8 imports the water it supplies to Simi Valley, which does not contain TCE. Opp. at 9:6–11. Again, this testing occurred post-late 1980's. Meier Decl., Ex. D, Ventura County Waterworks District No. 8 Annual Water Quality Reports 1989(a)–1997. Finally,

Defendants argue that water supplied by the Southern California Water Company ("SCWC") to Simi Valley also shows no signs of TCE contamination. Opp. at 9:11–17. Defendants provide various SCWC Water Quality Reports, the earliest dated 1990 to the most recent 1997 Report. Meier Decl., Exs. F–G.

14. A 1984 Rockwell International Internal Letter estimates that 400,000 gallons of TCE were discharged (using 50 gallons per engine test) at SSFL from 1953 through 1961, and estimates that 50% of this amount, or 200,000 gallons, was absorbed into the ground during this time. Thielemann Decl., Ex. 19, Rockwell International Internal Letter Re: Estimates of TCE Discharges at SSFl, dated March 19, 1984 at 1. In addition, this letter admits that while a TCE reclaim system was installed in 1960, "the system was unreliable with frequent spills." *Id.* For 1961–1976 an estimated 60,000 gallons of TCE were discharged with 30,000 gallons absorbed into the ground (based on a 50% absorption rate). *Id.* Finally, the letter indicates that from 1977 through 1983, TCE was used in only one area due to environmental regulations, but that three spills occurred for a total of 4,000 gallons discharged and approximately 2,400 gallons absorbed into the ground. *Id.*

15. Defendants do submit a report prepared by the Department of Water and Power in 1989 which states that "concentrations of TCE in water delivered to our customers are significantly less than drinking water standards." Meier Decl., Ex. A, Evaluation of Threat to Los Angeles' Water Supply From Contamination at Rocketdyne in Santa Susana Mountains at 2. Nevertheless, this evaluation does not change the Court's analysis as the report also indicates that "polluted groundwater beneath [the SSFL] could move directly into the San Fernando groundwater basin." *Id.* at 5. Furthermore, although water wells in current use are more than fifteen miles away, and thus probably not contaminated, *Id.* at 6, Plaintiffs and/or their property could have

plotted on Plaintiff's toxic dispersion map.[16] Hagar Decl., ¶ 15, Ex. 3; Thielemann Decl., Ex. 1.

### (2) Air Plumes—Testimony of Robert D. Sears

To further demonstrate the reasonableness of the Contamination Area in defining their Classes, Plaintiffs also submit the testimony of Robert D. Sears ("Sears"), a consulting scientist on air quality issues with B.S. and M.S. degrees in Atmospheric Science, who has prepared computer-based health risk assessment models ("HRAs") for the SSFL and Canoga facilities to measure "exposures and potential excess cancer risks caused by hexavalent chromium emissions associated with past activities at the SSFL and Canoga Avenue facilities." [17] Sears Decl., ¶¶ 1–2, 10, 16. Sears' HRAs are based on emission calculations prepared by Sears' colleague, Cliff Scholle ("Scholle"). Id. at ¶ 11. In addition, Sears calculated his HRAs based on the AC2588 exposure assessment model, which Sears helped co-develop, distributed by the California Air Pollution Control Officers' Association ("CAPCOA") and used to imple-

ment the CAPCOA Risk Assessment Guidelines. Id. at ¶¶ 5, 45. Sears' HRAs assess maximum individual cancer risk ("MICR") from exposure to hexavalent chromium.[18] Id. at ¶ 20. Sears' models plot "air plumes" in square miles from both the SSFL and Canoga facilities that represent MICR's equal to, five times, ten times, and fifty times greater than SCAQMD's notification level for hexavalent chromium as a result of Defendants' alleged hexavalent chromium emissions from each facility. Id. at ¶¶ 24–28; Exs. 3–6.

Defendants argue that Sears' air plumes do not constitute evidence of Defendants' hexavalent chromium emissions because the data used by Sears is based on assumptions provided by Scholle that are greater than the actual data.[19] For example, Defendants contend that Scholle incorrectly assumed that 73.986 to 739.860 pounds of hexavalent chromium was emitted per year by the SSFL, calculated by erroneously assuming that twelve cooling towers the size of the largest tower at the Canoga facility used chromates as a corrosion inhibitor. Opp. at 12:5–10. Likewise, Defendants contend that Scholle's

---

been exposed to TCE by the mere fact that it is in the groundwater, such as via percolation.

**16.** Defendants also contend that Hagar's model "does not reconcile with the actual scientific data regarding the Chatsworth formation and groundwater flows." Opp. at 6:6–12. Specifically, Defendants rely on Dickens' declaration in which Dickens declares that "[o]n-site pumping depressions would have restricted the lateral expansion of degraded groundwater away from the periphery areas of the facility," such that groundwater flow has been toward the center of the SSFL rather than toward the San Fernando and Simi Valleys. Dickens Decl., ¶ 6. However, the Court finds that Hagar's model which determined that "ground water would flow downgradient toward and eventually into the Simi Valley and San Fernando Valley," is not baseless. Hagar Supp.Decl. ¶ 6; Hagar Decl., ¶ 15. For instance, independent hydrogeology consultants, while admitting that pathways are difficult to predict, note that "there is a hydraulic gradient from the SSFL facility towards the San Fernando Valley to the east and southeast, and toward the Simi Valley to the northwest." Thielemann Decl., Ex. 17 (Hargis & Assoc., *Phase I* ) at 10. In addition, this report indicates that "[t]he most likely pathways are along fracture zones which trend off-site." Id. These findings support Hagar's assumption that "there is some degree of interconnection between the fracture system" from which Hagar derived approximations for

his advective flow model. Hagar Decl., Appendix A at 5.

Regardless, the differences between Hagar's and Dickens' theories of groundwater flow beneath the SSFL are issues that relate to the merits of Plaintiffs' claims. Thus, the Court will not engage in a "battle of the experts" at this stage of the litigation.

**17.** Sears' testimony "is limited to calculating the exposure that resulted from a heath risk assessment analysis and whether or not they're above the significance levels." Sears Depo. at 92:10–13.

**18.** An MICR "is the estimated increase in the probability of an individual contracting cancer as a result of continuous lifetime exposure to cancer-causing toxic air contaminants." Sears Decl., ¶ 20. The South Coast Air Quality Management District ("SCAQMD") and Ventura County Air Pollution Control District ("VCAPCD"), which include the Canoga and the SSFL facilities, respectively, require public notification of MICR's greater than or equal to 10 in one million. Id. at ¶¶ 21–22.

**19.** In addition, Defendants assert that because they have not had an opportunity to depose Scholle, they have not been able to probe into his background, expertise, or methodology. Opp. at 11 n. 36.

estimates of emission from "spray booths" at Canoga are incorrect because Scholle based his assumption on the operation of seven spray booths while Canoga has only one spray booth. *Id.* at 13:9–14:4. In addition, Defendants submit that only 2.3 pounds of hexavalent chromium, as opposed to Scholle's estimated 13.801 to 138.015 pounds, were emitted by the Canoga facility as a result of the plating and anodizing process according to SCAQMD data for 1989. *Id.* at 14:6–11.

The Court, however, is unconvinced that the evidence presented by Defendants establishes the unreliability of Sears' HRAs models. To support their rebuttal of Plaintiffs' assumptions, Defendants first submit the declaration of William McIlvaine ("McIlvaine"), a BNA environmental engineering specialist since 1992, who declares that (1) no chromates have been used at the Canoga or the SSFL facilities in the past twenty years; (2) no documentation could be located to confirm that chromates were ever used prior to the 1990 ban on the use of hexavalent chromium by both the SCAQMD and VCAPCD; and (3) the only two cooling towers at the SSFL close in size to that of the largest Canoga cooling tower either did not use chromates or lacked documentation regarding the use of chromates. McIlvaine Decl., ¶¶ 5–7. However, the fact that chro-

mates may not have been used in the past twenty years or that no documentation has been found to substantiate chromate use prior to the 1990 ban does not suggest that hexavalent chromium was not emitted from the SSFL and Canoga facilities *in the past,* such as during the 1940's through 1980's. In fact documents submitted by Defendants do evidence Defendants' use of hexavalent chromium. Most telling are Internal Letters produced by Defendants that reveal Defendants' ongoing concern regarding chromium use at the Rocketdyne Facilities and its environmental effects.[20] Additionally, samples taken from cooling towers between 1989 and 1995 detected the presence of chromium and evidence suggests that chromate paints were used at the Canoga facility in 1989.[21]

Defendants also rely on the declaration of Kim O'Rourke ("O'Rourke"), an environmental engineer for the SSFL, Canoga, and De Soto facilities since 1991, in which she declares that Plaintiffs' assumptions relied on by Sears are incorrect and "grossly overestimate emissions of hexavalent chromium." O'Rourke Decl., ¶¶ 1,5. However, the data on which O'Rourke relies to demonstrate the overestimation of Sears' assumptions relates to the reporting and evaluation of hexavalent chromium emissions and HRAs for the SSFL and Canoga facilities from *1990* to *1996.*[22]

20. *See, e.g.,* Niven Decl., Ex. 9 (Internal Letter, dated September 12, 1985, explaining that "Rocketdyne cannot consistently meet" the more stringent regulations regarding acceptable discharge limits on, *inter alia,* chromium and referring to plan to use non-chromium solutions where possible); Ex. 10 (Internal Letter, dated November 25, 1986, noting that sample from Canoga exceeded allowable limits for chromium and that "Environmental is concerned ... about those rinse waters which contain chromium"); Ex. 11 (Internal Letter, dated December 10, 1986, regarding D/502 Chromated Waste, stating that the D/502 uses chromated solutions which produce chromium-contaminated rinse water that is disposed of without removing the chromium and explaining "Environmental's" concern "that the quantity of chromium waste generated by D/502 is too large for the ... waste treatment plant" because it "can generate up to 1,200 gallons of chromium waste in an eight hour period"); Ex. 12 (Internal Letter dated January 19, 1987 reiterating that "Rocketdyne has been marginal on its compliance relative to chrome discharges ... and exceedances have actually occurred").

21. *See* Niven Decl., Ex. 3 (Pat–Chem Laboratories Wood Sample Analysis Report to Canoga facility dated February 15, 1995); Ex. 4 (SSFL Analytical Chemistry Sample of Sludge dated January 18, 1993); Ex. 5 (BC Laboratories Inc. Sample Analysis Report of Descaling Acid dated December 28, 1989); Ex. 6 (Facsimile Lead Sheet of Canoga facility and attached notes from Jennifer Taggart to Carole Elm, dated May 30, 1991, noting use of chromated paint in 1989).

22. *See, e.g.,* O'Rourke Decl., Ex. D (Letter from VCAPCD to Defendants dated April 4, *1991,* informing Defendants that their emission inventory plan is approved); Ex. G (Letter from VCAPCD to Defendants dated July 30, *1996,* categorizing Canoga facility as intermediate priority pursuant to AB2588 and informing Defendants that no health risk assessment is required); Ex. H (Letter from VCAPCD dated April 15, *1993,* informing Defendants that no health risk assessment of Canoga facility is required under AB 2588); Ex. M at 176 (Canoga Facility AB 2588 Health Risk Assessment, dated June 7, *1991,* prepared by ChemRisk Division McLaren/Hart Environmental Engineering, concluding that "[c]onsidering

O'Rourke Decl. at 3:10–19 (chart indicating actual emissions of hexavalent chromium from cooling towers in 1990 and 1993 as zero). Because chromate use was banned beginning in 1990, data indicating no hexavalent chromium emissions from 1990 to the present at the SSFL and Canoga facilities does not refute Sears' calculations based on estimates of *past* hexavalent chromium emissions, to which Defendants have admitted.

Moreover, Sears addresses the reasonableness of the assumptions provided to him by Plaintiffs. *See* Sears Supp. Decl., ¶ 4; O'Rourke Decl., Ex. A (April 1, 1998 Letter from Plaintiffs' counsel to Sears asking Sears to use certain assumptions in order to complete his HRAs). For example, Sears was told to assume that "Defendants used chromate in their cooling towers at concentrations ranging from 10 to 100 mg/L." O'Rourke Decl., Ex. A. In response, Sears declares that "it was common practice, prior to 1990, for facilities similar to Defendants' to use chromate in cooling towers" at these concentration levels. Sears Supp. Decl., ¶ 4(a); *see also* Sears Depo. at 138:16–25 (explaining that this concentration range is "very common" and noting that "Mr. Scholle has been calculating emissions for as long as I've know him, which is at least 15 years."); 174:4–22 ("chromate concentrations well over 100 ppm were very common in cooling towers" in the 1960's and 1970's before the 1990 ban).

In addition, Sears explains that Plaintiffs' assumption that the largest SSFL cooling tower is the same size as the largest Canoga cooling tower is in fact a conservative estimate, as "the combined size of Santa Susana's 50 cooling towers [acknowledged in Defendants' August 31, 1990 report to the VCAPCD] actually exceeds the sizes assumed by Plaintiffs." *Id.* at ¶¶ 4(b), 35–36; O'Rourke Decl., Ex. C (List of cooling towers at the SSFL submitted to the VCAPCD on August 31, 1990 indicating 50 cooling towers (11 of which were inactive as of that date) ranging from one ton to 10,000 tons (active)). Sears submits sufficient explanations for this stage of the litigation regarding the reasonableness of Plaintiffs' additional assumptions, as well.[23]

Finally, Defendants argue that Sears' HRAs are flawed because they were derived using inappropriate risk assessment methods. Specifically, Defendants contend that Sears' use of the CAPCOA risk assessment guidelines and the AB2588 risk assessment methodology, designed for regulatory purposes rather than medical monitoring, "overstates plausible exposures and risks" and "assumes a considerably higher cancer potency for hexavalent chromium." Kerger Decl.,[24] at 10:10–21; 12:5–11. In addition, Defendants question Sears' authority to judge the significance of heath risk assessments as he is not a toxicologist. *Id.* at 11:5–17. Like their objections to Sears' assumed

---

the inherent conservatism in the acceptable exposure levels (AELS) established by CAPCOA, [the results from the report's study of 1989 emissions in relation to the total hazard index for respiratory effects] suggest that the health hazards associated with the Rockwell Canoga Facility emissions are negligible.").

23. For instance, relating to Plaintiffs' assumption that the Canoga facility tanks used for anodizing operated at 11,000– and 2,300 amperes, Sears declares that this estimate is reasonable based on his experience and that Defendants have not submitted evidence to suggest otherwise. Sears Decl., ¶ 4(c); *see also* Sears Depo. at 141:1–3 (explaining that amperages in chrome plating operations can exceed 10,000 amps.). In addition, Plaintiffs' assumption that Defendants' operated seven paint booths at the Canoga facility for a combined maximum use of 500 gallons per year is supported in Sears' opinion by the seven existing permits for spray booths as of 1980,

documents indicating the use of several hundred gallons of paint likely to contain chromates, and the large amount of paint sludge shipped from the Canoga facility. *Id.* at ¶ 4(d); *see* Apenes Decl., Ex. 2 (EPA Hazardous Waste Permit Application, dated Nov. 17, 1980, with attachment indicating existing permits for seven spray booths); Niven Decl., Ex. 7 (SCAQMD Summary of Emissions, dated April 14, 1978, indicating use of 415 gallons of lacquer, 208 gallons of enamel (oil-based), and 208 gallons of primer per year); Apenes Decl., Exs. 3–4 (Rockwell's Hazardous Waste Activity Annual Reports for 1983 reporting storage and disposal of 1,412 gallons of paint sludge and solvent as of February 24, 1983 and 7,500 pounds as of December 31, 1983).

24. Brent D. Kerger, a defense expert, is a Principal Scientist and the Director of Health Science Resource Integration, Inc. and holds a bachelor's degree in chemistry and a Ph.D. in interdisciplinary toxicology. Kerger Decl. at 1:27–2:5.

data, however, the Court finds the above contentions equally unavailing for purposes of the instant motion.

First, whether the CAPCOA guidelines or other risk assessment guidelines should be used to determine MICRs is a question relating to the merits of Plaintiffs' claims. Moreover, the State of California has determined that the CAPCOA risk assessment guidelines are the best measure of cancer potency for toxins such as hexavalent chromium. Sears Supp. Decl., ¶¶ 23–25 Finally, in assessing the "significance" of health risk assessments for the SSFL and Canoga facilities, Sears merely determined whether the excess cancer risks he calculated based on the AB2588 model he helped develop were above or below the risk notification levels *already established* by the SCAQMD and VCAPCD. *Id.*, at ¶ 22.

### c. *Analysis Re: Ascertainability of Class Members*

In addition to generally challenging the boundaries of the Contamination Area, Defendants argue that class members for Plaintiffs' three Classes are not presently ascertainable.

### (1) Class I—Medical Monitoring

Defendants argue that it will not be administratively feasible for the Court to ascertain members of Class I ("Medical Monitoring Class") because in order to *exclude* members, an expert medical analysis of each member will be necessary to determine if the potential member has been "'diagnosed with a type of cancer or other serious illness or disease which may be attributed to exposure to . . . substances released from the Rocketdyne Facilities.'" Opp. at 24:9–19 (quoting Plaintiffs' FAC at ¶ 92(a)). Defendants contend that providing prospective members with questionnaires, as suggested by Plaintiff's expert, Dr. Vera Byers, will not work because "putative class members would have different subjective ideas of what constitutes a 'serious illness or disease.'" *Id.* at 25:7–10.

The Court, however, disagrees with Defendants' assessment of the feasibility of determining membership for the Medical Monitoring Class. First, the Medical Monitoring Class members are ascertainable by the fact that they lived or worked in the Contamination Area. Defendants' attempt to discredit Byers' *proposed* medical monitoring program by arguing that she is "misusing medical monitoring to determine exposure" is without merit. Guzelian Decl.,[25] at ¶ 5. Byers' assumption that the Medical Monitoring Class has been exposed to a statistically significant amount of hexavalent chromium, TCE, and ammonium perchlorate, is based on the fact that any medical monitoring program would not be administered until Plaintiffs have proven their claim that Defendants released toxic substances throughout the Contamination Area thereby exposing Plaintiffs to an increased risk for developing disease. Byers Supp. Decl., ¶ 12.

Thus, despite Defendants' suggestion, Plaintiffs' proposed medical monitoring program does comport with federal criteria for determining the appropriateness of medical monitoring under CERCLA wherein "[t]here should be evidence of contaminant levels in environmental media [in this case, the Contamination Area] that would suggest the high likelihood of environmental exposure to a hazardous substance and subsequent adverse health outcomes." Guzelian Decl., ¶ 5; 60 Fed.Reg. 38840, 38841 (1995). Obviously, as the litigation proceeds, if Plaintiffs are unable to establish that Defendants released toxins into the Contamination Area at concentrations posing an increased risk of disease, Plaintiffs' claims requesting medical monitoring relief will be moot.

Second, the Court rejects Defendants' theory that "there would have to be a medical and legal trial on causation [of illness] as to each prospective class member, just to figure out whether he or she is a class member," and finds their reliance on *Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D.Ga.1995) misplaced. Opp. at 25:2–6;

---

**25.** Philip S. Guzelian, M.D., a defense expert, is a Professor of Medicine at the University of Colorado Health Services Center and Chief of the Section of Medical Toxicology, and Co-director of the Hepatobiliary Research Center. Guzelian Decl., Ex A (Guzelian declaration submitted for October 10, 1997 hearing) at ¶ 1.

26:12–27:15. Instead the Court accepts, for purposes of class certification, Dr. Byers' representation that excludable class members [26] can be determined by "requiring each class member to complete a simple questionnaire concerning his or her health history." [27] Byers Decl., ¶ 33. If a questionnaire is used, each individual's medical records need not be examined. In addition, a preliminary hearing regarding his or her past diagnoses will be unnecessary as Dr. Byers has provided a list of the types of disease attributable to exposure to the chemicals Defendants allegedly released. *Id.*

Moreover, in *Newton,* the court denied class certification in part because it found that the plaintiffs' proposed class definition, which required members to "have specifically evidenced a keratosis," required "an individualized inquiry into the existence of an arsenical keratosis for each putative class member." *Newton,* 163 F.R.D. at 632. Plaintiffs' Medical Monitoring Class, however, does not require members to have a particular disease so that individual confirmation of a positive diagnosis, such as in *Newton,* is unnecessary. Reply at 16:10–18. Furthermore, as a practical matter, because Plaintiffs' medical monitoring program is designed as an "early warning system" for diseases associated with specific chemical exposure and requires affirmative participation by prospective class members, individuals who have already been diagnosed with a serious illness are unlikely to participate, as such a program would provide them with no real benefit.

**(2) Classes II and III—Property Class**

Additionally, Defendants contend that members of Class II and Class III ("Property Class") are not presently ascertainable because not even the Property Class representatives have had their "property, or the groundwater beneath it, tested to ascertain if it is contaminated ... incurred any CERCLA 'response costs,' ... [or] been advised that his or her property has been diminished in value." Opp. at 28:11–17. However, like the Medical Monitoring Class members, Plaintiffs' Property Class members are ascertainable by the fact that they are individuals who live and/or own property within the boundaries of the Contamination Area. Thus, Plaintiffs' Property Class members are *not* theoretical, unlike those in *In Re Three Mile Island Litig.,* 95 F.R.D. 164, 165 (M.D.Pa. 1982), cited to by Defendants, who were defined as business owners who "may have suffered economic harm" related to a nuclear accident.[28]

In addition, in this motion Plaintiffs provide sufficient evidence in the form of the toxic dispersion maps discussed above to demonstrate that release of property-contaminating toxins throughout the Contamination Area is plausible. Moreover, Plaintiffs are not required to test their property and provide proof of CERCLA response costs or diminution in value at this stage of the litiga-

---

**26.** According to the Medical Monitoring Class definition, persons who have been diagnosed "with a type of cancer or other serious illness or disease which may be attributed to exposure to the radioactive contaminants and/or hazardous, non-radioactive substances released from the Rocketdyne Facilities" are not eligible for membership in the Medical Monitoring Class. FAC at ¶ 92(a). Dr. Byers provides a list of these types of cancer or disease which are attributable to exposure with the chemicals analyzed by Dr. Byers. Byers Decl., ¶ 33. Because Plaintiffs' proposed medical monitoring program includes a restrictive list of excludable diseases, Defendants' concern that a hearing will be needed to determine if Defendants caused the prospective member's illness is unfounded.

**27.** Dr. Byers suggests that answers to the following questions "have been shown to be very accurate in determining the cancer status of a population:"

1. Have you ever had cancer? What kind?
2. Have you ever had a growth on your skin or in your body that had to be cut out?
3. Have you ever had radiation?
4. Have you ever had chemotherapy?

Byers Supp. Decl., ¶¶ 5–6. Thus, to determine whether a prospective plaintiff is eligible for membership in the Medical Monitoring Class, the plaintiffs need not be able to summarize all of their past diagnoses. *Id.* at ¶ 5.

**28.** The court explained that "where the class definition includes the factor of economic harm, there must be some evidence that the alleged members of the class suffered some financial detriment during the relevant period of time." *In re Three Mile Island Litig.,* 95 F.R.D. at 165–66. In contrast, the Property Class definitions require only that Plaintiffs own real property and/or presently reside or work within the Contamination Area. FAC, ¶ 92(b) and (c).

tion. Rather, *proof* of these issues relates to the *merits* of Plaintiffs' claims to be demonstrated as discovery proceeds during dispositive motions and/or trial.

### d. *Conclusion*

The Court notes that while Plaintiffs' Contamination Area is based in part on certain .assumptions regarding Defendants' activities at the Rocketdyne Facilities, these assumptions are reasonable for purposes of class certification. The Court recognizes the immense (and difficult) amount of discovery that must be conducted in order to prove or rebut Plaintiffs' claims relating to Defendants' alleged releases of hazardous substances over a fifty-year period and, therefore, realizes that some assumptions necessarily must be made at this stage of the litigation when discovery is incomplete. Furthermore, unlike their present motion, in October Plaintiffs presented no expert testimony or evidence to demonstrate to the Court that the boundaries of their Contamination Area were reasonably related to Defendants' activities. As detailed above, however, Plaintiffs now present some evidence to the Court establishing ascertainable Classes rationally related to Defendants' alleged releases of hazardous substances. *Boggs,* 141 F.R.D. at 61–62 ("Although the class definition is subject to refinement based upon further development of the record, and can be expanded or contracted, if the facts so warrant, there should be some evidence at this stage of the case that plaintiffs' definition is reasonable.").

Moreover, although the Court criticized Plaintiffs in its prior Order for failing to provide evidence that other substances, besides radioactive isotopes, had traveled across the entire Contamination Area, and for failing to provide information relating to other Rocketdyne Facilities besides the SSFL, the Court finds that Plaintiffs present evidence directed at emissions of TCE and hexavalent chromium from the SSFL and Canoga facilities, is sufficient to meet their

burden under Rule 23. Plaintiffs' evidence used to support the instant motion is distinguishable from that proffered in their original motion in that Plaintiffs originally relied only on one experts' report finding emissions of radioactive isotopes, but concluding that such emissions were within safe concentration levels.[29] In contrast, Plaintiffs' current Contamination Area is supported by the expert testimony discussed above.

Accordingly, the Court finds that Plaintiffs, for purposes of class certification, have provided reasonable Class definitions by demonstrating the release of some toxins from at least two of the Rocketdyne Facilities throughout the Contamination Area. Based on this Contamination Area, therefore, the Court finds that Plaintiffs have satisfied Rule 23(a)'s numerosity requirement as there are potentially thousands of residents in this area. *See* Motion at 22:8–19; Thielemann Decl., Ex. 57 (Groundwater Resources Consultants, Inc., *Preliminary Assessment Report Santa Susan Field Laboratory—Area II* (March 3, 1998)) at 5–6 (population of subdivisions and developments within three mile radius of the SSFL exceeds 100,000); Prior Order at 15:4–8; Schwarzer, Tashima, Wagstaffe, § 10:262 (explaining that "the numerosity requirement is satisfied 'when plaintiffs demonstrate that the number of potential class members is large even if plaintiffs do not know the exact figure' ") (quoting *Smith v. Babcock,* 748 F.Supp. 501, 505 (E.D.Mi.1990)). However, the Court notes that as discovery proceeds and data is made available, the boundaries of Plaintiffs' Contamination Area may change if this future evidence reveals that the assumptions relied upon by Plaintiffs' experts were incorrect or unreasonable. In addition, Plaintiffs' reference to specific toxins and sites may be stricken if no evidence relating to other toxins, besides TCE and hexavalent chromium, or other sites, besides the SSFL and Canoga facilities, is forthcoming.[30] Moreover, as discovery proceeds and the Court considers dispositive motions, the Court may always

---

**29.** *See* Prior Order at 13:3–14:10 discussing Plaintiffs' reliance on the "Woodward declaration."

**30.** In addition, the Court may also restrict the relevant time period for Plaintiffs' Medical Monitoring Class if determinations made during discovery require.

amend or vacate this certification Order as it deems necessary. Fed.R.Civ.P. 23(c)(1).

■ Finally, although the Court has considered evidence presented by the parties "that goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of [Plaintiffs'] case," the Court may not make an impermissible preliminary inquiry into the actual merits of Plaintiffs' claims. *In re Unioil Secs. Litig.,* 107 F.R.D. at 618; *see also Eisen,* 417 U.S. at 177–78, 94 S.Ct. at 2152–53 (inquiry into the merits inappropriate at class certification stage). Thus, any findings made in this Order relating to evidence presented for purposes of Plaintiffs' motion for class certification are limited to this Order and do not bear on any future rulings the Court may make as it considers the merits of this case during dispositive motions and/or trial.

### 2. Commonality

#### a. *Standard*

■ According to Rule 23(a)(2), a class action is maintainable only if "there are questions of law or fact common to the class." However, not every issue in the case must be common to all class members. Schwarzer, Tashima & Wagstaffe § 10:273. The fact that individual issues remain "after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188 (6th Cir.1988). Rather, there must be some issue involved that is common to the entire class and relief must " 'turn on questions of law applicable in the same manner to each member of the class.' " *General Tel. Co.,* 457 U.S. at 155, 102 S.Ct. at 2369, 102

S.Ct. 2364 (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–701, 99 S.Ct. 2545, 2557–2558, 61 L.Ed.2d 176 (1979)). Thus, class certification is appropriate where "common issues (of fact or law) [are] of sufficient importance to the class that the court is convinced that the most efficient method of determining the rights of the parties is through a class action." Schwarzer, Tashima & Wagstaffe § 10:274.

#### b. *Analysis*

In its prior Order, although denying class certification, the Court determined that Plaintiffs had satisfied Rule 23(a)'s commonality requirement, both as applied to the Class and the Property Owner Subclass. Prior Order at 16–20. Defendants, however, argue that because Plaintiffs' latest definition of the Contamination Area has changed, Plaintiffs' Classes no longer involve common issues. The Court addresses Defendants' argument as it relates to both the Medical Monitoring Class and combined Property Class below.

##### (1) Common Issues to Medical Monitoring Class

■ Defendants contend that commonality is lacking for Plaintiffs' Medical Monitoring Class because the Contamination Area consists of distinct areas involving four different facilities over different periods of time, thereby implicating different conduct and actors and requiring differing analyses, depending on the chemical and time period at issue, to determine causation and whether an individual is entitled to medical monitoring. Opp. at 30:8–32:2. Defendants submit that because *Potter v. Firestone Tire and Rubber Co.*[31] requires each individual to establish his

---

31. 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993) (In Bank). In *Potter,* the California Supreme Court held that "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable." *Id.,* Cal.4th at 1009, 25 Cal.Rptr.2d at 579, 863 P.2d 795. "[S]ignificance and extent of the plaintiff's exposure to chemicals" is a relevant factor in "determining the reasonableness and necessity of monitoring." *Id.*

Plaintiffs, however, do not seek to recover the "cost of medical monitoring." Rather, Plaintiffs seek the implementation of a class-wide medical monitoring program which does not involve writing a check to each individual to be used for his or her own personal medical monitoring program. If Plaintiffs prevail on their claims showing that Defendants released an unhealthful amount of toxins into the Contamination Area, then Plaintiffs will have also demonstrated the "significance and extent" of the Contamination Area's exposure to chemicals. It is the Contamination Area's exposure to chemicals which de-

or her chemical exposure and related dose in order to recover medical monitoring, "common proof cannot possibly resolve the question of whether medical monitoring is appropriate for the class." *Id.* at 32:3–17.

Despite the differences in Plaintiffs' current Class definitions, Defendants put forth a similar argument in opposing Plaintiffs' original motion for class certification. *See* Prior Order at 16:20–26 (reciting Defendants' argument "that because the alleged releases occurred at different times, from different sites and involved different hazardous substances, no single course of conduct exists for which BNA's liability would be a common issue to the Class"). However, in rejecting Defendants' argument, the Court explained that class certification is not defeated merely because "facts fluctuate over the class period and vary as to individual claimants," if there are common questions as to "liability or as to the cause or impact of the tortious action." *Yslava*, 845 F.Supp. at 712 (quoting *In re Asbestos School Litig.*, 104 F.R.D. 422, 429 (E.D.Pa.1984)); *see also DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171 (8th Cir.1995) (finding commonality in class action against bank for overescrowing accounts despite fact that individuals with different mortgage contracts will have different claims of differing strengths).

As the Court found in its prior Order, Plaintiffs' Classes continue to pose questions subject to common proof, such as whether Defendants' conduct in operating, owning, or managing the Rocketdyne Facilities was negligent, subject to strict liability, and/or in violation of CERCLA. Prior Order at 17:14–18:2; FAC at ¶ 99; *see also In re Asbestos School Litig.*, 104 F.R.D. 422, 429 (E.D.Pa. 1984), *aff'd (re Rule 23(a))in part, rev'd in part*, 789 F.2d 996 (3rd Cir.1986) (finding that class satisfied the commonality prerequisite because elements of defendants' breach of legal duties "can be established by com-

mon proof, which, although it may be complex, does not vary from class-member school to class-member school"). Moreover, what types of chemicals Defendants may have released and the extent to which these chemicals have contaminated the groundwater, soil, and air in the Contamination Area are common questions necessary to determine whether the Medical Monitoring Class is entitled to the relief it seeks.

The Court, therefore, finds that there are key issues of fact or law, including Defendants' liability for their "course of conduct" at the Rocketdyne Facilities and whether Defendants' alleged releases of hazardous substances have placed the Medical Monitoring Class at a potentially increased risk of heath problems, that do not vary from class member to class member, thereby satisfying the commonality prerequisite for class certification. Furthermore as discovery proceeds, and if it becomes necessary, the Court can amend its certification Order and either delete a facility or create subclasses as to facility, time period, or specific regions within the Contamination Area.[32]

### (2) Property Class

As with the Medical Monitoring Class, Defendants reiterate their argument presented during Plaintiffs' initial motion for class certification that "questions of whether a given plaintiff's property has been contaminated by Rocketdyne's operations, and when and how, or whether a plaintiff has incurred necessary 'response costs' as a result of those operations have to be resolved individually as to each plaintiff and property." Opp. at 34:2–8. However, as with the Medical Monitoring Class, questions such as whether Defendants breached a duty with regard to their activities at the Rocketdyne Facilities, whether Defendants should be held strictly liable for those activities, or whether Defendants' alleged activities constitute a nuisance,

termines whether medical monitoring for the community is necessary because the fact that chemicals were allegedly released at statistically significant levels into the Contamination Area is what puts those who live or work in that area at a higher risk for disease. *See also* 60 Fed.Reg. 38840, 38841 (explaining that "[d]ocumentation of individual levels of exposure is not required"

to determine appropriateness of a medical monitoring program under CERCLA).

**32.** For example, if it appears that one facility is primarily responsible for the release of a chemical, the Court can create a subclass as to that facility to determine questions of liability as to that facility in particular.

are common to all members of the Property Class. Thus, while damages may vary for each individual class member, relief for the Property Class turns on these significant common "questions of law applicable in the same manner to each member of the class." *General Tel. Co.*, 457 U.S. at 155, 102 S.Ct. 2364.

Moreover, many of the issues raised in Defendants' Opposition, such as Defendants' argument that "the issue of whether diminution or stigma damages are legally available to a given class member is always factually unique," relate to Rule 23(b)(3)'s predominance element, which involves an examination by the Court that is much more meticulous than the commonality requirement of Rule 23(a)(2). Opp. at 35:17–19; *see Amchem Products, Inc.*, 521 U.S. 591, 117 S.Ct. at 2250 (finding that "the predominance criterion is far more demanding" than the commonality requirement). Based on the above and the Court's analysis with regard to the Medical Monitoring Class, the Court finds that Plaintiffs have satisfied their burden of establishing commonality for the Property Class as well.

### 3. Typicality

#### a. *Standard*

 Under Rule 23(a)(3), the court may certify a class action only where "the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" The typicality prerequisite may be met "even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages by the representative parties and the other members of the class." Wright, Miller & Kane § 1764, at 235–41. Thus, while the class representatives' claims need not be identical to those of absent class members, the class representatives must " 'possess the same interest and suffer the same injury' as the class members." *General Tel. Co.*, 457 U.S. at 156, 102 S.Ct. at 2370; *see also California Rural Legal Assistance v. Legal Services Co.*, 917 F.2d 1171, 1175 (9th Cir.1990) (explaining that Rule 23 "does not require that the named plaintiffs ... be identically situated with all other

class members. It is enough if their situations share a 'common issue of law or fact'); *Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D.Cal.1984) (citing Newberg on Class Actions, § 8816, at 850 (1977) for the proposition that "the typicality requirement should be loosely construed."). The party seeking class certification will satisfy rule 23(a)(3)'s typicality requirement if the representatives' claims stem from the same event or course of conduct as other class members' claims and are based on the same legal theory as the absent members. *See Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir.1992); *see also In re United Energy Corp.*, 122 F.R.D. 251, 256 (C.D.Cal.1988).

#### b. *Analysis*

#### (1) Medical Monitoring Class Representatives

 Essentially Defendants argue that Plaintiffs have failed to meet their burden to establish that the Samuels claims are typical of the Medical Monitoring Class because Plaintiffs have not demonstrated that the Samuels' are entitled to medical monitoring relief according to *Potter*; the Samuels do not have viable claims because they are barred by the statute of limitations; Mr. Samuels is not eligible for inclusion in the Medical Monitoring Class because he has had a basal cell carcinoma; and the Samuels are not typical of the various plaintiffs in the Contamination Area because they live only within the Canoga Air Plume. Opp. at 36:15–40:2. Plaintiffs, on the other hand, contend that the Samuels' claims are typical of the Medical Monitoring Class because they live within the Contamination Area and, thus, share the same injury as other class members; Defendants cannot establish that the Samuels' claims are time barred on the face of the FAC, and Mr. Samuels is eligible for Class I membership because the Class definition, as explained by Dr. Byers, does not exclude persons whose cancer has been surgically cured. Reply at 19:15–20:18.

In its prior motion for class certification, Plaintiffs presented Class Representatives already afflicted with or having close relatives with serious illnesses, such as cancer. Prior Order at 22:12–14. Thus, while the

Representative Plaintiffs' sought to establish the same *legal* claims as the Class, such as negligence, their *injuries* were markedly different from Class members who had not yet been diagnosed with any disease, causing the Representative Plaintiffs to fail the typicality requirement. *Id.* at 22:10–12. In finding that the Representatives' claims lacked typicality, the Court highlighted the fact that the Representatives would "not advance the interests of those class members seeking medical monitoring for early detection of disease" as those already diagnosed with cancer would focus their efforts on a remedy providing funds for treatment.[33] *Id.* at 23:2–24:27.

In the instant motion, however, Plaintiffs seek to certify a Medical Monitoring Class in which persons *with* the diseases outlined in Dr. Byers' declaration are *excluded* from the Class. Now all members of Plaintiffs' current Medical Monitoring Class will share the same interest, the early *detection* of latent disease. No members seek costs for *treatment* of disease. Plaintiffs' new definition for their Medical Monitoring Class, therefore, addresses the Court's concerns relating to the Representative Plaintiffs outlined in its prior Order. Thus, because Plaintiffs' Class I Representatives, the Samuels, do not already suffer from a serious illness, or have close relatives who so suffer, and the Samuels live within the Contamination Area, the Court finds that their claims are typical of those of the Class and that the Samuels share the same interest as that of the Class. *See, e.g. Boggs,* 141 F.R.D. at 65–66 (finding typicality for claims of class representatives who sought medical monitoring for early cancer detection due to exposure to radioactive materials). Below, however, the Court will address Defendants' specific arguments as described above.

First, the Court does not find the Samuels' claims atypical of the Medical Monitoring Class merely because Plaintiffs have not demonstrated the Samuels' eligibility for medical monitoring relief based on the *Potter* criteria. The Samuels' claims arise from the same course of conduct as the Medical Moni-

toring Class: Defendants' alleged releases of harmful substances from the Rocketdyne Facilities. Furthermore, as the Court discussed above in the commonality section, if Plaintiffs prevail on their claim that Defendants released toxins at statistically significant levels into the Contamination Area, then Plaintiffs will have also demonstrated the "significance and extent" of the Samuels' or other class member's exposure to those chemicals, as persons living or working in the exposed Area. *Potter,* 6 Cal.4th at 1009, 25 Cal.Rptr.2d at 579, 863 P.2d 795; note 31 *supra.* In addition, the fact that Plaintiffs' Class I Representatives reside in only one part of the Contamination Area, the Canoga Air Plume, is insignificant for typicality purposes as the Samuels' interests are aligned with absent members such that they need not be *identically* situated with all other class members. *General Tel. Co.,* 457 U.S. at 156, 102 S.Ct. at 2370; *California Rural Legal Assistance,* 917 F.2d at 1175.

Moreover, in response to Defendants' statute of limitations argument, Plaintiffs assert that the FAC alleges that the Representative Plaintiffs "did not discover the actual cause of [their] injuries … until September 11, 1997, the date of the public release of the UCLA Study which concluded that workers at the [SSFL] had an increased risk of contracting cancer…." FAC ¶ 189. Defendants submit various newspaper articles regarding possible exposure to toxic substance from the Rocketdyne Facilities that the Samuels testified they had read years ago, as evidence that their claims are barred by the one-year statute of limitations. *See* Exhibits attached to Tittmann Decl.; Opp. at 37:12–28:8. However, the fact that the Samuels read these articles alone does not establish Defendants' affirmative defense. Because Defendants have not *proven* that the Samuels' claims are time-barred and discovery has not concluded, the Court does not find that the Samuels' claims lack typicality based on the statute of limitations.

Finally, the Court declines to find that Mr. Samuels is excluded from the Medical Moni-

---

**33.** In addition, Plaintiffs' original medical monitoring remedy consisted of a *monetary fund* to pay for medical monitoring, rather than a court-

supervised *program* to be administered classwide.

toring Class due to his past basal cell skin cancer.[34] As Dr. Byers sets forth in her declaration, an individual with "a cancer which is advanced to a degree that it *cannot be surgically cured*" would be excluded from the medical monitoring program. Byers Decl., ¶ 33(a) (emphasis added). Moreover, even if Mr. Samuels is excludable, Mrs. Samuels certainly is not, leaving Plaintiffs with a typical representative. For all of the reasons set forth above, therefore, the Court finds at this time that the Samuels' claims are typical of those of the Medical Monitoring Class.

### (2) Typicality of Property Class Representatives

■ Defendants contend that the Property Class Representatives' claims are not typical of the claims advanced by Class I or Class II because Plaintiffs have not shown that any of the Representatives' properties are contaminated or that they have incurred response costs. Opp. at 41:8–14. In addition, Defendants point out that none of the Representatives own residences within the Groundwater Plume. *Id.* at 41:15–19. However, in its Prior Order the Court found that the claims of the Property Owner Subclass Representatives, who asserted similar claims as those for Class II and Class III Representatives in the instant motion, satisfied the typicality requirement. Prior Order at 25–26. Additionally, as the Court explained in its analysis regarding the ascertainability of potential Property Class members, at this stage of the litigation Plaintiffs need not provide proof of contamination, CERCLA response costs, or diminution in value to their property as these issues relate to the *merits* of the Representatives' claims, not to their *typicality*.

Moreover, the lack of a Property Representative in the Groundwater Plume does not affect the typicality of the Property Representatives' claims. In its prior Order, the Court explained:

> [w]hile ... many different types of property exist within the [Property Class], all owners of property within the [Class] will seek similar remedies from their claims,

mainly money damages, for any injury caused to the property from Defendants' alleged releases of harmful substances. The type of property in question is an individual issue that will address the amount of damages available to the claimant rather than the nature of the remedy itself.... Thus, while the Representative Plaintiffs may not be "identically situated with all other class members," because the Plaintiffs share the same injury and interest of potentially contaminated property, Plaintiffs' claims are typical of those of the members of the [Property Class].

Prior Order at 25:25–26:5 (quoting *California Rural Legal Assistance*, 917 F.2d at 1175). Therefore, because the Property Representatives' claims arise from "the same set of circumstances," Defendants' alleged releases of contaminants from the Rocketdyne Facilities, the Court finds that any factual differences do not "create any conflict between [the Property Representatives] and the potential class members" who reside in the Groundwater Plume. *Cook,* 151 F.R.D. at 385–86.

In addition, in assessing the typicality of the Property Representatives' claims previously, the Court found as follows:

> First, the [Representative's] claims are based on the same legal theories as the claims brought on behalf of the Class, such as negligence, strict liability, and CERCLA violations. In addition, the Plaintiffs will advance the interests of the Subclass because all Representatives own property allegedly exposed to hazardous substances due to Defendants' conduct. [In addition] ..., Plaintiffs' claims for damages for their property do not conflict with other property owner's claims for similar damages.

Prior Order at 25:14–19. As the nature of their claims remains essentially the same as those discussed in relation to Plaintiffs' first motion, the Court finds that its prior analysis still applies to the typicality of the current Representatives' claims as compared to the claims of Class II and Class III. Thus, based

---

**34.** Mr. Samuels' skin cancer was treated by an MOS procedure, an in-office excision of the can-

cerous area. H. Samuels Depo. at 54:12–56:6.

on the above, the Court finds that the Property Representatives' claims are typical of those of the Property Class at this time.

### 4. Adequacy of Representation

#### a. *Standard*

 Rule 23(a)(4) provides that certification of a class action is only appropriate where "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997). Whether the class representatives will adequately represent the class depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir. 1981). The Ninth Circuit has held that representation is "adequate" where counsel for the class is qualified and competent, the representatives' interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive. *In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir.1982) ("*Dalkon Shield*"); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978).

 Representation will most likely be adequate where the representative's interests are comparable to those of the absent class members, similar to the typicality inquiry of Rule 23(a)(3). Schwarzer, Tashima & Wagstaffe § 10:306. However, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Wright, Miller & Kane § 1768, at 326–27. In addition, while the size of an individual representative's interest is not irrelevant to the adequacy inqui-ry, the extent of a representative's interest is not a determinative factor. *Id.* § 1767, at 318–19.

#### b. *Analysis*

##### (1) Adequacy of Representatives for Medical Monitoring Class

 Defendants' arguments relating to the representativeness prong of Rule 23 are essentially the same as those they articulated to contest the typicality of the Representative Plaintiffs' claims which the Court has already rejected. Opp. at 42:3–43:7. Similar to the Court's inquiry into the typicality of the Samuels' claims, the Court finds that because the Samuels share the same interest in both determining Defendants' liability and the relief sought as to the Property Owner Subclass, the Samuels will adequately represent the Medical Monitoring Class.

Moreover, the Court's original finding that Plaintiffs' Class Representatives were inadequate related to its concern described above, relating to the conflict of interest between the Representatives with cancer and potential class members free of disease. The Court explained that "[b]ecause the interest of the Representative Plaintiffs in the medical monitoring remedy is fundamentally at odds with absent class members' interests, the Court finds that the named Plaintiffs cannot fairly and adequately protect the interests of the Class seeking medical monitoring." Prior Order at 28:10–14. In contrast, because Plaintiffs' current Medical Monitoring Class includes only uninjured, exposure-only plaintiffs, the Court finds that its prior concerns regarding possible conflicts of interest no longer exist.[35] Thus, any differences between the Samuels' situation and absent members of the Medical Monitoring Class do not involve the subject matter of the litiga-

---

**35.** Specifically, the Court no longer finds that the issues raised by the Supreme Court in *Amchem Products, Inc.*, with regard to representativeness apply to Plaintiffs' Classes. In that case, as explained in the Court's prior Order, the Supreme Court upheld the Third Circuit's finding that the named plaintiffs would not adequately represent the class, because the named parties with varying medical conditions sought to represent a class which included uninjured, exposure-only claim-ants. 521 U.S. 591, 117 S.Ct. at 2251. This factual difference between the representatives and absent class members created a conflict because the currently injured representatives' goal was immediate damages, while those who had only been exposed desired a future fund for medical monitoring. *Id.* Plaintiffs' current definition for the Medical Monitoring Class, however, eliminates this situation.

tion, as explained in the Court's typicality analysis.

Because the Court finds that Plaintiffs' counsel is competent [36] and the Samuels' interests are not antagonistic to the interests of absent class members, the Court finds that the Samuels can adequately and fairly represent the Medical Monitoring Class.

### (2) Adequacy of the Property Class Representatives

■■■ As with the Medical Monitoring Class, Defendants do not assert any new arguments that have not been previously rejected by the Court to support their contention that the Property Class Representatives are inadequate. Opp. at 43:8–44:11. Furthermore, the Court already determined in its prior Order that "because the [Representative] Plaintiffs share the same interest in both determining Defendants' liability and the relief sought ..., the [Representative] Plaintiffs will adequately represent" Class II and Class III. Prior Order at 28:17–29:2.

As with the Samuels, any differences between the Representative Plaintiffs' and absent Property Class members' situations do not involve the subject matter of the litigation. Rather, as explained in the Court's typicality analysis, the Representative Plaintiffs share the same interest as the absent members of the Property Class—compensation for possible contamination to their property. The fact that different properties may have incurred different injuries does not preclude the Representative Plaintiffs from providing adequate representation to absent members. An interest by the Property Class Plaintiffs in diverse damage awards does not constitute "antagonism" to the absent members within Class II and Class III. *Dalkon Shield*, 693 F.2d at 855 (explaining that "absence of antagonism" is a factor to determine adequacy of representation). Therefore, at this time, the Court finds that the named Representatives can adequately and fairly represent the Property Class.

In regard to the Court's finding of typicality and representativeness, however, the Court notes that it is aware that the Representative Plaintiffs may be found to be inadequate representatives or to have atypical claims. For example, if later determinations reveal that the Representative Plaintiffs' properties have not in fact been exposed or damaged by the alleged releases of hazardous substances by Defendants, then the Court could not find that Plaintiffs had established the adequacy criterion.[37] Without actual property exposure to contamination and without living in an area exposed to statistically significant levels of toxic chemicals, the Representative Plaintiffs would lose any colorable claim of property damage or medical monitoring that they might have had, and thus would no longer "possess the same interest and suffer the same injury as the Class members." *Amchem Products, Inc.*, 521 U.S. 591, 117 S.Ct. at 2250–51 (citation and internal quotation marks omitted).

### C. Rule 23(b) Requirements

After satisfying Rule 23(a)'s four prerequisites, the party seeking certification must demonstrate that the action satisfies the requirements of one of Rule 23(b)'s sections in order to maintain the class action. Plaintiffs contend that certification of the Medical Monitoring Class is proper under 23(b)(2) and that certification of the Property Class is proper under 23(b)(3). FAC at ¶ 97; Motion at 27–29.

### 1. Rule 23(b)(2)—Medical Monitoring Class

#### a. *Standard*

■■■ Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Because certification of a class ac-

---

**36.** Defendants do not contest counsel's competency.

**37.** Likewise, if discovery reveals that the Samuels do not live in an area exposed to dangerous toxins, obviously the Court could not find that their claims were typical of the Medical Monitoring Class or that they could adequately represent absent members.

tion under Rule 23(b)(2) is appropriate only where final injunctive or declaratory relief with respect to the class as a whole is appropriate, Rule 23(b)(2) class treatment is unavailable where the primary relief sought by the class is monetary damages. *See, e.g., Nelsen v. King County,* 895 F.2d 1248, 1255 (9th Cir.1990); *In re School Asbestos Litig.,* 789 F.2d at 1008; *Doninger,* 564 F.2d at 1314; *Haley,* 169 F.R.D. at 657. However, Rule 23(b)(2) may include cases seeking monetary damages where such relief is "merely incidental to their primary claim for injunctive relief." *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986).

### b. *Analysis*

 In its prior Order, the Court found that it could not certify its Class under 23(b)(2) because Plaintiffs sought relief in the form of a reserve *fund* to pay for the cost of a medical monitoring program, as well as compensatory and punitive damages. Thus, the Court found that Plaintiff had not met their burden establishing that the monetary relief they sought was "merely incidental to their primary claim for injunctive relief." *Probe,* 780 F.2d at 780; Prior Order at 34:9–35:14. In their present motion, however, Plaintiffs attempt to certify a class that seeks injunctive relief in the form of a "court-supervised program of medical monitoring." FAC at 67:19–68:3. Class I Plaintiffs do not seek compensatory, exemplary, or punitive damages. *Id.* at 68:4–24.

Defendants, however, argue that Plaintiffs are still unable to certify their Medical Monitoring Class under 23(b)(2). First, Defendants argue that, according to Plaintiffs, Defendants have not "acted ... on grounds generally applicable to the class," because Defendants engaged in a different manner with respect to the residents in the Groundwater Plume, the SSFL Air Plume, and the Canoga Air Plume. Opp. at 44:18–45:2. Nevertheless, the Court finds that Defendants' multiple releases from different facilities do constitute actions generally applicable to the Medical Monitoring Class.[38] It is pre-

cisely the alleged releases of hazardous substances throughout the Contamination Area over a fifty-year span which Plaintiffs contend have subjected them to an increased risk of developing latent disease. Moreover, the medical monitoring program Plaintiffs seek to establish may be administered class-wide, as the tests will be geared toward exposure to the specific chemicals Plaintiffs will later attempt to *prove* were all released by Defendants. *See* Byers Decl., ¶¶ 23, 29–32 (explaining that medical monitoring program "should be designed specifically for the suspected chemical exposure," and providing various tests to detect exposure to TCE, hexavalent chromium, and ammonium perchlorate). Additionally, Defendants own, control, and operate all of the Rocketdyne Facilities.

Second, Defendants contend that the medical monitoring program Plaintiffs seek is unavailable because California, via the California Supreme Court's holding in *Potter,* recognizes that medical monitoring relief is a compensable item of *damages,* providing Plaintiffs with an adequate remedy at law. Opp. at 45:3–14. However, *Potter,* did not hold that medical monitoring relief is limited to money damages. 6 Cal.4th at 1009, 25 Cal.Rptr.2d at 579, 863 P.2d 795 (holding that "the cost of medical monitoring is a compensable item of damages"). Rather, *Potter* determined that while no independent tort cause of action for medical monitoring exists, a plaintiff may recover the cost of future medical monitoring. *Id.* 6 Cal.4th at 1007, 25 Cal.Rptr.2d at 578, 863 P.2d 795. Recovering the *cost* of future medical monitoring on an individual basis, however, will not provide Plaintiffs with the relief they seek, as Plaintiffs' program is designed not only to detect signs of latent disease, but also to *share information* regarding the identification and development of latent diseases among class members. Motion at 28:4–12. Finally, several courts have considered and certified a court-supervised medical

---

**38.** See discussion, *supra* at Section III.B.2.b.(1), regarding common issues relating to Plaintiffs' claims despite the fact that Defendants' allegedly released various chemicals from four facilities over different periods of time.

monitoring program pursuant to Rule 23(b)(2).[39]

Finally, Defendants, relying on the decertification of the *Barnes* class, argue that "the individual issues that . . . pervade an inquiry into whether the class members have a right to medical monitoring relief" render Plaintiffs' Medical Monitoring Class non-cohesive and inappropriate for certification under 23(b)(2). Opp. at 46:5–22. In *Barnes*, the court decertified a medical monitoring class it had originally certified under 23(b)(2) upon learning that plaintiffs' claims still turned on whether individual class members were "addicted" to cigarettes, a causation issue the court determined could not be resolved on a class-wide basis and that destroyed the cohesiveness of the class.[40] *Barnes v. The American Tobacco Co., Inc.*, 176 F.R.D. 479, 499–501 (E.D.Pa.1997).

In the instant case, however, Plaintiffs' medical monitoring program does not require the Court to inquire into the individual causation issues described in *Barnes*. *See* Byers Reply Decl., ¶¶ 14–17 (explaining that medical monitoring programs assume and compensate for the fact that "individuals exposed to hazardous chemicals have a wide variety of variables which will determine their reaction to chemicals" and declaring that "[d]etermination of the cause of the disease, and treatment of it, has absolutely nothing to do with the medical monitoring program"). As explained in Section III.B.1.c. of this Order, Plaintiffs' medical monitoring plan does not require the examination of individual health records, as excludable plaintiffs can be identified by questionnaire. Otherwise, membership in the Medical Monitoring Class is established by the fact that the individual lived or worked in the Contamination Area. Perhaps more importantly, trying Plaintiffs' claims relative to Class I will serve the dual

---

**39.** In fact, this Court noted in its prior Order that "[i]f Plaintiffs later decide to seek relief only in the form of a court-supervised medical monitoring program for early detection of disease, rather than treatment, at that time the Court may consider Plaintiffs' request to maintain the Class under Rule 23(b)(2)." *See also Barnes v. The American Tobacco Co., Inc.*, 176 F.R.D. 479, 486–87 (E.D.Pa.1997) (originally certifying a medical monitoring class action under 23(b)(2) where plaintiffs only sought court-supervised medical monitoring program for early detection of disease and did not seek additional damages); *Yslava*, 845 F.Supp. at 708, 712 (certifying class under (b)(2) seeking court-supervised medical monitoring program to detect disease when damages plaintiffs sought were for medical monitoring costs already incurred, rather than general compensatories and punitives); *Cook*, 151 F.R.D. at 387–88 (holding class seeking medical monitoring met 23(b)(2) requirements where medical monitoring was a cause of action and plaintiffs did not appear to seek punitives).

**40.** For 23(b)(2) certification, the Third Circuit requires an examination of the "cohesiveness" of the class, and suggests that " 'court[s] should be more hesitant in accepting a(b)(2) suit which contains significant individual issues then it would under subsection 23(b)(3).' " *Barnes*, 176 F.R.D. at 488 (quoting *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D.Pa.1976)). The Ninth Circuit, however, has specifically stated that "[a]lthough common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.1998). As explained above, Plaintiffs complain that Defendants have released toxic substances into their community, subjecting Plaintiffs to an increased risk of developing latent diseases associated with those toxins.

Regardless, even if the Court were to perform the Third Circuit's "cohesion analysis," the Court would still find Class I suitable for certification under 23(b)(2), or 23(b)(3) for that matter. The Court's findings in its prior Order that *individual*, rather than common issues predominated the Class, related to the fact that Plaintiffs' Class included members with cancer who might seek to recover the costs of *treatment* from the medical monitoring fund. These individuals sought relief for personal injuries, requiring each member to demonstrate that Defendants had proximately caused the member's disease and raising a host of individual issues, such as individual risk factors. Prior Order at 39:12–42:9. However, the Court specifically noted that "a jury might be able to find that Defendants have generally caused an increased risk of diseases, such as cancer, for the Class." *Id.* at 42:4–6. Plaintiffs' current Medical Monitoring Class, which does not provide for treatment or treatment costs, only requires this general causation, as an individual will be entitled to relief if he or she lives within the Contamination Area that has been exposed to a statistically significant level of toxins. Moreover, the Court originally concluded that Plaintiffs' Class lacked cohesiveness because of the conflict of interest between class members seeking treatment and those seeking early detection of disease. *Id.* at 42:10–43:14. This conflict no longer exists under Plaintiffs' current medical monitoring plan.

purposes of Rule 23, as it will enable the Court to resolve Plaintiffs' claims relating to Defendants' release of toxins in one action, as well as provide Plaintiffs, who individually might not have the means to do so, the opportunity to assert their rights to medical monitoring relief. Finally, it is important to note that the *Barnes* court did not decertify the class until the *evidentiary record at the summary judgment stage* revealed that the plaintiffs' action was not maintainable as a class. *Barnes,* 176 F.R.D. at 498.

Based on the above, therefore, the Court conditionally finds that Class I, which seeks injunctive relief in the form of a court-supervised medical monitoring program that does *not* also provide for the *treatment* of discovered diseases,[41] is suitable for certification pursuant to 23(b)(2).

### 2. Rule 23(b)(3)—Property Class

#### a. *Standard*

A class action may be maintained under Rule 23(b)(3) if "questions of law or fact common to the members of the class predominate," and if "a class action is superior to other available methods." Thus, the party seeking certification must establish *both* predominance of common issues and superiority of the class action.

#### (1) Predominance of Common Questions of Law or Fact

■■■■■ "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino,* 97 F.3d at 1234. Thus, the court must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." Wright, Miller & Kane § 1778 at 528. For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact merely exist, as it is under Rule 23(a)(2)'s commonality requirement. *Id.* at

526–27. Although the proponent may satisfy the commonality requirement of Rule 23(a), the predominance inquiry under Rule 23(b) is much more rigorous. *Amchem Products, Inc.,* 521 U.S. 591, 117 S.Ct. at 2250. The predominance question "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.,* 521 U.S. 591, 117 S.Ct. at 2249. The court, therefore, must balance concerns regarding issues common to the class as a whole with questions affecting individual class members. *Dalkon Shield,* 693 F.2d at 856.

#### (2) Superiority of Class Action

■■■■■ In addition to a predominance of common questions, the proponent must also demonstrate that the class action is the superior method of adjudication of the controversy. *See Valentino,* 97 F.3d at 1235 (explaining that the party seeking certification needs to make a "showing [as to] why the class mechanism is superior to alternative methods of adjudication"). While the 1966 Advisory Committee Notes for Rule 23 explain that mass tort actions are not " 'ordinarily appropriate' for class treatment, ... the text of the rule does not categorically exclude mass tort cases from class certification." *Amchem Products, Inc.,* 521 U.S. 591, 117 S.Ct. at 2250; *see also Valentino,* 97 F.3d at 1230–31. Thus a class action may be superior where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino,* 97 F.3d at 1234. However, the court must also consider other issues, such as:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be en-

---

**41.** *See* Byers Reply Decl., ¶¶ 16–17 (representing that treatment of any disease detected during a class member's participation in the medical monitoring program "will not be performed by the health care professionals running the monitoring program, nor will the monitoring program pay for it.").

countered in the management of a class action. Fed.R.Civ.Pro. 23(b)(3).

■ For instance, the greater the number of individual issues, the more difficult it will be for the court to manage the class action. *See e.g., Dalkon Shield,* 693 F.2d at 856. Thus, a class action is improper where an individual class member would be compelled to try "numerous and substantial issues to establish his or her right to recover individually, after liability to the class is established." Schwarzer, Tashima & Wagstaffe § 10:361. On the other hand, the fact that individual members seek separate damages is not fatal to class treatment. *Id.*

#### b. *Analysis*

##### (1) Predominance of Common Issues to Property Class

■ In its prior Order, the Court determined that Plaintiffs had "not demonstrated how issues common to the [Property Class] outweigh those questions affecting individual class members." Prior Order at 43:17–19. In so finding, the Court explained that Plaintiffs had not shown the Court how "class-wide determination of exposure levels for certain [parts of the Contamination Area] will contend with the fact that two properties next to each other may have different contamination levels" due to various geographic conditions. *Id.* at 44:6–10. In addition, although Plaintiffs submitted that the loss of property values could be determined on an area-wide basis for purposes of their stigma claim, because the Contamination Area consists of not only residential properties, but also industrial and commercial facilities, the Court concluded that "individual proximate cause issues permeate a diminution in value analysis." *Id.* at 44:14–45:13.

Defendants argue that the Court's previous analysis still applies to Class II and Class III as "common proof cannot show the existence and extent of contamination" in all of the Plume areas and "[c]ommon issues do not predominate in determining whether the classes' properties are contaminated or in assessing the 'stigma' attached to those properties." Opp. at 47:14–48:3. However, unlike their earlier motion, Plaintiffs now adequately explain to the Court how the common issues regarding Defendants' liability predominate over individual issues. Specifically, Plaintiffs address the Court's concern that *individual* proximate cause questions will overshadow the common questions relating to Defendants' liability for releasing harmful substances into the Contamination Area.

Plaintiffs now represent that they will establish on a class-wide basis "[the] extent to which the population and real property surrounding the Rocketdyne Facilities was exposed to Defendants' releases of the Contaminants ... by means of expert testimony ... through scientific modeling using discoverable information concerning the nature of Defendants' operations and the properties of the Contaminants released."[42] Motion at 30:16–22. This method of proof will involve answering questions that will not differ with each class members' claims, such as what contaminants did Defendants release and how much was released, the pathways of release, and what areas have been exposed to toxins, as well as the common questions relating to Defendants' liability outlined in this Order's analysis regarding commonality.[43] *Id.* at 30:22–9. "These common issues represent the core of [P]laintiffs' action against [D]efendants," and, therefore, predominate Plaintiffs' claims.[44] *Cook,* 151 F.R.D. at 389 (explaining that "to the extent that the claim of each plaintiff depends upon proof concerning these common issues, it would serve no purpose to force multiple trials to hear the same evidence and decide the same issues").

---

**42.** Plaintiffs' proposed method of proof is known as "dispersion reconstruction." Motion at 30:2.

**43.** For instance, whether Defendants' conduct in operating, owning, or managing the Rocketdyne Facilities was negligent, subject to strict liability, and/or in violation of CERCLA. *See supra* at Section III.B.2.b.(2).

**44.** See also discussion in *Cook* 151 F.R.D. at 388–389, where the Court provides a list of common questions similar to those at issue in this case, including, "what caused the releases; what precautions to avoid emissions were taken; whether the geographic dispersion of the releases in the surrounding environment was reasonably foreseeable," etc.

Furthermore, "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendants' liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988).

Perhaps more importantly, Plaintiffs also now present expert testimony, lacking in their initial motion, to explain how Plaintiffs' claims that seek diminution in value of their property due to stigma may be proven on a class-wide basis. In its original Order, the Court found that individual proximate cause issues permeated a diminution in value analysis because diverse communities and properties exist within the Contamination Area. Prior Order at 45:3–13. Plaintiffs' expert John D. Radke ("Radke"),[45] however, represents that through a "hedonic price model" using a "multiple regression analysis," Radke can assess the loss of property values on an area-wide basis despite the fact that the Contamination Area contains various types of properties. *See* Radke Decl., at 4–13. Throughout his declaration, Radke explains how his model can account for differences in property type and communities by including different factors as variables in his model, enabling him to analyze property depreciation for an environmentally-affected community.[46] *Id.* In addition, Radke notes that differences between property types can also be resolved by separating property types into categories or subclasses, such as commercial or residential. *Id.* at 16:24–26. Finally, although Defendants present their own expert witness who disagrees with Radke's analysis, as the Court has reiterated throughout this Order, whether Plaintiffs are actually able to prove up their claims as they represent is a question relating to the *merits* of Plaintiffs' action.

Because the Court finds that adjudication of common issues regarding Defendants' alleged releases of contaminants will promote judicial economy, and based on Plaintiffs' representations of expert testimony demonstrating their ability to establish their property claims on a class-wide basis, the Court concludes that Plaintiffs have adequately explained how common issues predominate their claims. Furthermore, the issue as to whether Plaintiffs can demonstrate property contamination and stigmatization on a class-wide basis will most likely be revisited at the dispositive motion stage. "[I]f [the Court] finds, after ruling on the parties' dispositive motions, that individual issues actually preclude litigating this case on a class-wide basis," the Court can always vacate its certification Order. *Barnes,* 176 F.R.D. at 491; *see also In re School Asbestos Litig.,* 789 F.2d at 1011 (acknowledging district court's ability to decertify class "if the issues it has classified as substantial later appear insufficient to justify the class procedure").

### (2) Superiority of Class Action for Property Class

In its prior Order, the Court found superiority lacking primarily based on Plaintiffs' inability at that time to demonstrate how it could resolve substantial individual questions on a class-wide basis and on Plaintiffs' failure to show the Court how a class trial could be conducted given these individual issues. Prior Order at 45–47. As explained above, however, Plaintiffs now explain how core issues relating to proof of their claims can be determined on a class-wide basis. In addition, proof of core issues, including whether Defendants acted with reasonable care to prevent the release of chemicals; what chemicals were released and in what amounts; whether Defendants acted intentionally; whether the toxic releases were foreseeable; whether Defendants' activities have had an economic impact on the surrounding communities, etc., will not vary from one class member to the next, such that "class-wide litigation of [these] issues will reduce litigation

---

**45.** John D. Radke is a professor at the University of California, Berkeley in the departments of Landscape Architecture and Environmental Planning, City and Regional Planning, and Geography. Radke Decl., ¶ 2. He holds bachelor's and master's degrees in Geography, as well as a Ph.D. *Id.* at ¶ 3.

**46.** Radke's model will determine the economic impact on property due to its proximity to the Rocketdyne Facilities as a *percentage* of the total value of the property, enabling Radke to predict the percent diminution of those properties. Radke Supp.Decl., ¶¶ 3, 6.

costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234; *see also Cook*, 151 F.R.D. at 388–89.

. Moreover, because individual members of Class II and Class III share similar, non-antagonistic interests with regard to their claims, no one individual member will have a strong interest in controlling the prosecution of his or her claims in a separate action. Rule 23(b)(3)(A). This is especially true considering that absent class certification, most individual plaintiffs' Class II and Class III claims probably will not be litigated due to the daunting expense of discovery and procuring expert testimony on an individual basis.

Finally, in contrast to their prior motion, Plaintiffs present a proposed preliminary trial plan demonstrating to the Court how this case might be tried as a class. *See* Cappello Decl., ¶¶ 13–18. Plaintiffs propose to structure the trial in stages, presenting issues subject to proof on a class-wide basis, with the initial stage directed at issues of liability; the second relating to the award of non-monetary relief; and the third stage determining monetary damages, such as the devaluation of property as a result of stigma created by proximity to the Rocketdyne Facilities. *Id.* at ¶¶ 15–18. Plaintiffs propose that remaining individual issues, such as the amount of response costs an individual is entitled to under CERCLA, can be adjudicated "under the supervision of a court-appointed magistrate or retired judge." [47] *Id.* at ¶ 18. Plaintiffs' proposed plan provides the Court with a better sense of how this case might be managed.[48]

Therefore, because Plaintiffs have demonstrated that common issues predominate over the individual issues found in the claims for Class II and III and have made a showing as to why class litigation is superior to individual litigation, the Court finds that Class II and Class III are appropriately certified under Rule 23(b)(3).

### III. Conclusion

For all of the reasons set forth above, the Court finds that the existence of common issues necessary to establish each individual class member's claims in this case furthers the dual purposes of Rule 23—to promote judicial economy and provide individuals with smaller claims the opportunity to assert their rights—and, thus, justifies this Court's certification of Class I, Class II, and Class III at this time. Therefore, the Court hereby ORDERS that Plaintiffs' motion for class certification is conditionally granted.[49]

**SO ORDERED.**

---

**47.** The Court reiterates that the fact that individual members seek separate damages is not fatal to class treatment. Schwarzer, Tashima & Wagstaffe § 10: 361.

**48.** The Court recognizes that organizational and trial management issues will be revisited and revised during the course of this litigation.

**49.** As the Court has noted throughout this Order, as the evidentiary record develops and dispositive motions are filed, the Court may *sua sponte* alter, amend, or vacate this certification Order at any time before a decision on the merits is made. Rule 23(c)(1).